

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

DESTYNIE WRIGHT,         )
        )
        Appellant,         )
        )
v.         )         WD84046
        )
STATE OF MISSOURI,         )         Opinion filed:  October 19, 2021
        )
        Respondent.         )

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
### THE HONORABLE SANDRA MIDKIFF, JUDGE

Special Division:  Thomas N. Chapman, Presiding Judge,
Edward R. Ardini, Jr., Judge, and W. Douglas Thomson, Judge

Destynie Wright ("Wright") appeals the denial of her Rule 29.15 motion for post-conviction relief by the Circuit Court of Jackson County ("motion court") following her convictions for involuntary manslaughter, assault in the second degree, and armed criminal action. Because Wright's amended motion was untimely filed by her appointed counsel, we reverse and remand to the motion court to conduct an abandonment inquiry.

## Factual and Procedural Background

In the underlying criminal case, Wright was charged as an accomplice with one count of murder in the first degree and one count of assault in the first degree. Wright was also charged

with two counts of armed criminal action and one count of tampering with physical evidence. The evidence at trial established:[1]

> On December 31, 2015, Wright drove herself and her friend Kierra Ramsey ("Ramsey") to a New Year's Eve party at a dance hall in Kansas City. In the early hours of January 1, 2016, Ramsey's ex-boyfriend, Sederick Jones ("Jones"), arrived at the party, intent on encouraging Ramsey to leave with him. Jones followed Wright and Ramsey into the women's restroom, blocking their exit until a member of the cleaning crew forced them to leave the building. Outside, Jones continued pressing Ramsey to leave with him, and was arguing with Wright. Wright and Ramsey tried to leave in Wright's car, but Jones got into the backseat. Jones continued to argue with Wright and Ramsey for about an hour. During that time, Wright was using her cell phone to text her boyfriend, Ramon Boyd ("Boyd"), in relevant part as follows:

> > Boyd: Keep [Jones] there.
> >
> > Wright: Okay.
> >
> > Wright: He is in my car.
> >
> > Wright: Come get him now.
> >
> > Boyd: Okay, pulling up.
> >
> > Wright: Parking lot.
> >
> > Boyd: Okay
> >
> > Wright: NOW!!!!!!!!!!!!!!!!
> >
> > Boyd: Is he still there?
> >
> > Wright: YES TK[2] COME GET HIM
> >
> > Boyd: I am. I got you.
> >
> > Wright: PASSENGER SIDE
> >
> > Wright: Now, TK

---

[1] We quote the facts from this Court's opinion in Wright's direct appeal. *State v. Wright*, 585 S.W.3d 360, 364-66 (Mo. App. W.D. 2019).

[2] Boyd went by the nickname "TK."

2

Wright: )U007

Boyd: Ok. 2 mins

Wright: he gotta gun dude come the fuck on

Boyd: Here.

Shortly after this exchange, Jones and Ramsey exited Wright's vehicle. Boyd shot Jones four times, killing Jones. Ramsey was shot twice. Gunfire shattered a window on Wright's vehicle.

Wright fled the scene in her car. Boyd called Wright moments after the shooting, but Wright did not initiate any calls, including to 911. Wright drove to her sister's house, and parked the car. Boyd met her there. The two retreated to Boyd's home, where Wright stayed until she returned to her sister's house the next morning.

The next morning, Kansas City Police Detectives Jeremy Wells ("Wells") and Darin Penrod ("Penrod"), were looking for Wright as they knew she had been a witness to the shooting. They were contacted by Wright's sister, who told them that Wright was now at her house. . . . Wells and Penrod asked Wright if she would be willing to go to the police station to provide a statement. Wright agreed to do so.

. . .

At the beginning of the interview, Wright verbally consented to the Detectives' request to search her cell phone for any information that might be helpful to the investigation.

Wright then provided a statement. Wright explained that she and Ramsey had gone out for the evening; that Ramsey and Jones had been arguing on the phone earlier in the evening; that Jones showed up unexpectedly at the dance hall and began harassing them; and that Jones entered the backseat of her car as she and Ramsey were attempting to leave. Wright told the Detectives that Jones was flashing a gun, and that when Ramsey finally agreed to leave with Jones, she heard gunshots as they exited Wright's car. Wright described seeing Jones and Ramsey fall to the ground, but said she had no idea who shot them. Wright told the Detectives she "blacked out," and fled the scene out of fear. Wright made no mention of Boyd or of his involvement in the shooting. Wright first told the Detectives that she drove away from the scene without checking on the victims, went walking, and eventually sat outside until morning before resetting her phone around 6:00 a.m. Later in the interview, Wright said that she drove to her sister's house after leaving the scene, parked her car, and then walked with no particular destination before ending up at an unknown driveway where she sat and waited for several hours before returning to her sister's house the next morning. . . .

3

The Detectives then asked Wright to sign a written form verifying her consent to search her cell phone. Wright again told the Detectives she had been required to hard reset her phone the night before because it had gotten too cold while she was out walking. Wright asked if she could have a lawyer review the consent form. Wright was advised that she did not have to sign the form if she did not want to. Wright did not sign the consent form.

Wells and Penrod took a break from the interview, leaving Wright alone in the unlocked interview room. When they returned, their questioning of Wright remained cordial, but became more aggressive. . . .

When Penrod continued to press Wright to tell the truth, Wright requested an attorney[.] . . .

In total, Wright's interview lasted about two hours. When the interview concluded, Wright was not arrested, and was taken back to her sister's house. The Detectives told Wright at the end of her interview that they would be retaining her cell phone and securing a warrant to search its contents. As a result of that search warrant, the texts exchanged with Boyd prior to the shooting were discovered.

The jury found Wright guilty of the lesser-included offenses of involuntary manslaughter and assault in the second degree, in addition to tampering with physical evidence, and both counts of armed criminal action. On December 15, 2017, the trial court sentenced Wright to seven years in the Department of Corrections for each offense except the tampering with physical evidence count for which she received a sentence of four years. The sentences were ordered to run consecutive to each other.

Wright appealed her convictions, which were affirmed by this Court. *State v. Wright*, 585 S.W.3d 360 (Mo. App. W.D. 2019). Our mandate issued on October 30, 2019. Wright filed her *pro se* motion for post-conviction relief under Rule 29.15 on January 29, 2020. Post-conviction counsel was appointed on March 23, 2020, and, following a thirty-day extension granted by the motion court, the amended motion was due on June 22, 2020. Post-conviction counsel later sought and received an additional thirty-day extension, resulting in the amended motion being due by July 21, 2020. Appointed counsel filed Wright's amended motion on July 21, 2020.

4

In the amended motion, post-conviction counsel raised five claims, each of which differed from those raised in Wright's *pro se* motion. Following an evidentiary hearing, the motion court denied the claims asserted in Wright's amended motion for post-conviction relief. Wright appeals from the denial of her amended post-conviction motion.

**Discussion**

Wright raises a single point on appeal asserting that the motion court erred in denying her post-conviction claim that she received ineffective assistance of trial and appellate counsel through the failure to lodge an objection at trial, and raise claims on appeal, directed at verdict director 11 (involuntary manslaughter) and verdict director 23 (assault in the second degree), arguing that there lacked substantial evidence to support those verdict directors and that they did not comply with MAI-CR3d and its Notes on Use. However, before we consider this claim of error, we must address the State's argument that Wright's amended motion for post-conviction relief was not timely filed.

"'Time limits for post-conviction relief motions are mandatory[,]" and "we must 'enforce the mandatory rules created by the Supreme Court of Missouri.'" *Briggs v. State*, 621 S.W.3d 614, 617 (Mo. App. W.D. 2021) (quoting *Maguire v. State*, 536 S.W.3d 247, 248 (Mo. App. E.D. 2017)) (additional citation omitted). "'Failing to abide by the Rule's [time limits] generally functions as a complete waiver' of the right to seek review." *Id.* (quoting *Maguire*, 536, S.W.3d at 248) (additional citation omitted) (alteration in *Briggs*).

In this case, the timeliness of Wright's amended motion turns on which version of Rule 29.15 governs her post-conviction proceeding. This question is resolved by Rule 29.15(m) (2018), which states, in pertinent part, that "[i]f sentence was pronounced prior to January 1, 2018, postconviction relief shall continue to be governed by the provisions of Rule 29.15 in effect on the

date the motion was filed or December 31, 2017, whichever is earlier." Wright was sentenced on December 15, 2017. Thus, although Wright's post-conviction action was initiated on January 29, 2020, the proceeding is to be governed by the version of Rule 29.15 in effect on December 31, 2017.

> The 2017 version of Rule 29.15(g) stated the following:
>
> If an appeal of the judgment sought to be vacated, set aside, or corrected is taken, the amended motion shall be filed within 60 days of the earlier of the date both the mandate of the appellate court is issued and:
>
> (1) Counsel is appointed, or
>
> (2) An entry of appearance is filed by any counsel that is not appointed but enters an appearance on behalf of movant.
>
> The court may extend the time for filing the amended motion for one additional period not to exceed 30 days.

Under this rule, the motion court was authorized to extend the deadline for the filing of an amended motion one time for a "period not to exceed 30 days." Here, the motion court exhausted this authority when it granted a thirty-day extension at the time counsel was appointed, thereby establishing June 22, 2020, as the deadline for the filing of the amended motion. Prior to that deadline, the motion court purported to grant an additional thirty-day extension until July 21, 2020—the date appointed counsel later filed Wright's amended motion. However, as explained above, the applicable version of Rule 29.15(g) did not authorize this second extension resulting in the amended motion being untimely.[3]

"'If the amended motion was untimely, the motion court was required to make a record of an independent inquiry into abandonment before considering the claims and evidence presented in

---

[3] Any confusion on the part of the motion court concerning the extent of its authority to extend the due date for the filing of the amended motion is understandable and likely traced to the fact that the version of Rule 29.15 in effect at the time Wright's post-conviction action was instituted permitted the motion court to grant extensions totaling sixty days (as opposed to the thirty days allowed under the predecessor rule applicable to this action).

6

the amended motion.'" *Johnson v. State*, 613 S.W.3d 512, 515 (Mo. App. E.D. 2020) (quoting *Barber v. State*, 569 S.W.3d 556, 559 (Mo. App. E.D. 2019)). "While it is the duty of appellate courts to enforce the mandatory timelines in the post-conviction rules, the motion court is the appropriate forum to conduct an abandonment inquiry." *Id.* (citing *Blackburn v. State*, 468 S.W.3d 910, 913 (Mo. App. E.D. 2015)). "Upon review of the record, if we determine the motion court failed to make an independent inquiry or there is no record for us to review such inquiry, then we must reverse and remand for the motion court to conduct this inquiry." *Id.* (citing *Brown v. State*, 602 S.W.3d 846, 850 (Mo. App. E.D. 2020)).

Because Wright's amended motion was untimely, a presumption of abandonment attaches, and the motion court must conduct an independent inquiry to determine if abandonment occurred. *See Johnson*, 613 S.W.3d at 516; *Moore v. State*, 458 S.W.3d 822, 825 (Mo. banc 2015). Nothing in the record indicates that the motion court conducted the required inquiry into the timeliness of Wright's amended motion; therefore, we must remand this case to the motion court for that purpose.[4] *See Johnson*, 613 S.W.3d at 516 ("[W]e must remand the case because the motion court is the appropriate forum to conduct such an inquiry.").

---

[4] On remand, "a sufficient record must be made to demonstrate on appeal that the motion court's determination on the abandonment issue is not clearly erroneous." *Johnson*, 613 S.W.3d at 517 (quoting *Milner v. State*, 551 S.W.3d 476, 480 (Mo. banc 2018)). "'The result of the inquiry into abandonment determines which motion—the initial motion or the amended motion—the court should adjudicate.'" *Id.* (quoting *Moore*, 458 S.W.3d at 826).

Although there is an exception to the requirement for remand where a motion court considered all of the claims raised in both the *pro se* and amended motions, in the instant case the *pro se* motion and amended motion include different claims, and the motion court only adjudicated the claims raised in the amended motion. *See Childers v. State*, 462 S.W.3d 825, 828 (Mo. App. E.D. 2015). Therefore, remand is required.

**Conclusion**

This case is reversed and remanded for the motion court to conduct an abandonment inquiry.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.